**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ESTHER CHOPP, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GENWORTH FINANCIAL, INC., WILLIAM H. BOLINDER, G. KENT CONRAD, MELINA E. HIGGINS, THOMAS J. MCINERNEY, DAVID M. MOFFETT, THOMAS E. MOLONEY, JAMES A. PARKE, and JAMES S. RIEPE,<br><br>Defendants. | Case No.: ____________________<br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

Plaintiff Esther Chopp, by and through her attorneys, alleges upon personal knowledge as to herself, and upon information and belief based upon, among other things, the investigation of counsel, as to all other allegations herein, as follows:

**SUMMARY OF THE ACTION**

1. This shareholder class action is brought by Plaintiff on behalf of holders of the common stock of Genworth Financial, Inc. ("Genworth" or the "Company") against the Company's Board of Directors (the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9 and to enjoin the acquisition of the publicly owned shares of Genworth common stock by China Oceanwide Holdings Group Co., Ltd. ("China Oceanwide") through its newly formed subsidiary Asia Pacific Global Capital Co., Ltd.

("Parent" or "Asia Pacific"), and Parent's U.S.-incorporated wholly-owned subsidiary Asia Pacific Global Capital USA Corporation ("Merger Sub") ("Proposed Transaction").

2. Genworth is the country's largest underwriter and issuer of long term care ("LTC") insurance and specializes in life and mortgage insurance ("MI").

3. Asia Pacific is a United States and Asia-Pacific focus merchant bank, global financial and strategic management consulting firm, specializing in providing advisory services in cross-border mergers and acquisitions, asset development, recapitalization, private equity and investment banking. Asia Pacific is a limited liability company incorporated in the People's Republic of China. Asia Pacific Global is a Delaware corporation formed to affect the Proposed Transaction.

4. On October 23, 2016, Genworth and China Oceanwide jointly announced that they had entered into a definitive agreement ("Merger Agreement") pursuant to which Asia Pacific will acquire the common stock of Genworth for $5.43 per share in cash ("Offer Price"), which equates to a total transaction value of approximately $2.7 billion. The Proposed Transaction also includes a $1.1 billion cash infusion by China Oceanwide to fulfill debt obligations maturing in 2018 and to shore up Genworth's U.S. Life Insurance business segment.

5. The Board has hamstrung its ability to consider competing, better offers. It has agreed to provisions in the Merger Agreement that (i) prohibit it from soliciting any such other offers, (ii) provides Asia Pacific with "information rights" that requires Asia Pacific be informed of the identity of any rival bidder and the material terms of any competing bid; (iii) provides Asia Pacific with "matching rights" whereby it has five (5) business days to match any better offer, and (iv) requires the Company to pay a whopping $104 million termination fee to Asia

Pacific under certain circumstances if the Proposed Transaction is not consummated, including if the Board receives a superior offer that Asia Pacific does not match.

6. On December 21, 2016, Genworth filed a Preliminary Proxy Statement on Schedule 14A (the "Proxy") with the U.S. Securities and Exchange Commission ("SEC"). The Proxy, which recommends that Genworth stockholders vote in favor of the Proposed Transaction, omits or misrepresents material information concerning, among other things: (i) the Company's management's projections, utilized by the Company's financial advisors, Goldman, Sachs & Co. ("Goldman Sachs") and Lazard Frères & Co. LLC ("Lazard") in their financial analyses; (ii) the valuation analyses performed by Goldman Sachs and Lazard in connection with the rendering of their fairness opinions; and (iii) the sale process leading up to the Proposed Transaction. The failure to adequately disclose such material information constitutes a violation of the above-referenced sections of the Exchange Act as stockholders need such information in order to cast a fully-informed vote in connection with the Proposed Transaction.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

8. This Court has jurisdiction over Defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as well as under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, because a substantial portion of the actionable conduct took place in this District.

## PARTIES

### Plaintiff

10. ***Plaintiff Esther Chopp*** ("Plaintiff") is, and at all relevant times was, a continuous stockholder of Genworth.

### The Company

11. Genworth is a Delaware corporation with its principal executive offices located in Richmond, Virginia.

### Board of Directors

12. ***Defendant William H. Bolinder*** ("Bolinder") has served as a member of the Board since October 2010.

13. ***Defendant Gaylord Kent Conrad*** ("Conrad") has served as a member of the Board since March 2013.

14. ***Defendant Melina E. Higgins*** ("Higgins") has served as a member of the Board since September 2013.

15. ***Defendant Thomas J. McInerney*** ("McInerney") has served as a member of the Board, President, and Chief Executive Officer ("CEO") since January 2013.

16. ***Defendant David M. Moffett*** ("Moffett") has served as a member of the Board since December 2012.

17. ***Defendant Thomas E. Moloney*** ("Moloney") has served as a member of the Board since October 2009.

18. ***Defendant James A. Parke*** ("Parke") has served as a member of the Board since May 2004.

19. ***Defendant James S. Riepe*** ("Riepe") has served as a member of the Board since March 2006, Lead Director from February 2009 to May 2012 and Chairman of the Board since May 2012.

20. Defendants Bolinder, Conrad, Higgins, McInerney, Moffett, Moloney, Parke, and Riepe are collectively referred to herein as the "Board" or the "Individual Defendants."

21. Collectively, Genworth and the Individual Defendants are referred to herein as the "Defendants."

## OTHER RELEVANT ENTITIES

22. China Oceanwide is a privately held, family-owned international financial holding group headquartered in Beijing, China. Its operations include financial services, energy, culture and media, and real estate assets worldwide.

23. Parent is a limited liability company incorporated in the People's Republic of China and a subsidiary of China Oceanwide.

24. Merger Sub is a Delaware corporation and an indirect wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

25. Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on her own behalf and as a class action on behalf of the other public holders of Genworth common stock ("Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation or other entity related to or affiliated with any of Defendants.

26. This action is properly maintainable as a class action.

27. The Class is so numerous that joinder of all members is impracticable. As of December 15, 2016, there were approximately 586,814,568 shares of Genworth common stock issued and outstanding, held by at least hundreds of individuals and entities scattered throughout the country.

28. Questions of law and fact are common to the Class, including, among others:

(a) Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(b) Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

(c) Whether Plaintiff and the other members of the Class would suffer irreparable injury were the Proposed Transaction consummated.

29. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

30. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications, or substantially impair or impede their ability to protect their interests.

31. Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## FACTUAL ALLEGATIONS

32. Genworth is the country's largest underwriter and issuer of LTC insurance and also specializes in life and mortgage insurance. It is headquartered in Richmond, Virginia.

33. Genworth's stock traded at nearly $10.00 per share just two years ago during November 2014. Certain issues with its reserving for its LTC and Australian MI business segments have caused the Company's stock to suffer since then, but the stock price was trading at $5.21 per share just before the Proposed Transaction was announced with an Offer Price of only $5.43.

### The Proposed Transaction

34. On October 23, 2016, Genworth and China Oceanwide issued a press release announcing the Proposed Transaction:

> China Oceanwide Holdings Group Co., Ltd. ("China Oceanwide") and Genworth Financial, Inc. (NYSE: GNW) ("Genworth") today announced that they have entered into a definitive agreement under which China Oceanwide has agreed to acquire all of the outstanding shares of Genworth for a total transaction value of approximately $2.7 billion, or $5.43 per share in cash. The acquisition will be completed through Asia Pacific Global Capital Co. Ltd., one of China Oceanwide's investment platforms. The transaction is subject to approval by Genworth's stockholders as well as other closing conditions, including the receipt of required regulatory approvals.
>
> As part of the transaction, China Oceanwide has additionally committed to contribute to Genworth $600 million of cash to address the debt maturing in 2018, on or before its maturity, as well as $525 million of cash to the U.S. life insurance businesses. This contribution is in addition to $175 million of cash previously

committed by Genworth Holdings, Inc. to the U.S. life insurance businesses.

Separately, Genworth also announced today preliminary charges unrelated to this transaction of $535 to $625 million after-tax associated with long term care insurance (LTC) claim reserves and taxes. Those items are detailed in a separate press release. The China Oceanwide transaction is expected to mitigate the negative impact of these charges on Genworth's financial flexibility and facilitate its ability to complete its previously announced U.S. life insurance restructuring plan. Genworth believes this transaction is the best strategic alternative to maximize stockholder value.

James Riepe, non-executive chairman of the Genworth Board of Directors said, "The China Oceanwide transaction is the result of an active and extensive review process conducted over the past two years under the supervision of the Board and with guidance from external financial and legal advisors. The Board is confident that the sale of the company to China Oceanwide is the best path forward for Genworth's stockholders."

Upon the completion of the transaction, Genworth will be a standalone subsidiary of China Oceanwide and Genworth's senior management team will continue to lead the business from its current headquarters in Richmond, Virginia. Genworth intends to maintain its existing portfolio of businesses, including its MI businesses in Australia and Canada. Genworth's day-to-day operations are not expected to change as a result of this transaction.

China Oceanwide is a privately held, family owned international financial holding group founded by Mr. Lu Zhiqiang. Headquartered in Beijing, China, China Oceanwide's well-established and diversified businesses include operations in financial services, energy, culture and media, and real estate assets globally, including in the United States. Businesses controlled by China Oceanwide have more than 10,000 employees globally.

"Genworth is an established leader in both mortgage insurance and long term care insurance, which are markets that present significant long-term growth opportunities," added Mr. Lu, Chairman of China Oceanwide. "We are impressed by Genworth's purpose and its focus on helping people manage the financial challenges of aging as well as achieving the dream of homeownership. In acquiring Genworth and contributing $1.1 billion of additional capital, we are providing crucial financial support to Genworth's efforts to restructure its U.S.

> life insurance businesses by unstacking Genworth Life and Annuity Insurance Company (GLAIC) from under Genworth Life Insurance Company (GLIC) and address its 2018 debt maturity. In order to close the transaction and achieve these objectives, we have structured the transaction with the intention of increasing the likelihood of obtaining regulatory approval." Tom McInerney, President & Chief Executive Officer of Genworth concluded, "We believe that this transaction creates greater and more certain stockholder value than our current business plan or other strategic alternatives, and is in the best interests of Genworth's stockholders. China Oceanwide is an ideal owner for Genworth going forward. They recognize the strength of our mortgage insurance platform and the importance of long term care insurance in addressing an aging population. The capital commitment from China Oceanwide will strengthen our business and increase the likelihood of obtaining regulatory approval."
>
> Genworth will continue to focus on its key financial priorities, including strengthening the balance sheet and stabilizing and improving ratings over time, particularly in its U.S. MI business. Genworth will also continue to focus on its key operational priorities, most notably executing its multi-year LTC rate action plan, which is essential to stabilizing the financial position of the legacy LTC business. China Oceanwide has no current intention or future obligation to contribute additional capital to support Genworth's legacy LTC business.
>
> The transaction, which has been approved by both companies' boards of directors, is expected to close by the middle of 2017, subject to the requisite approval by Genworth's stockholders as well as certain other closing conditions, including the receipt of regulatory approvals. Both China Oceanwide and Genworth have initiated discussions with regulators in key jurisdictions.
>
> Goldman, Sachs & Co. and Lazard are acting as financial advisors to Genworth. Willkie, Farr & Gallagher LLP and Weil, Gotshal & Manges LLP are acting as legal advisors to Genworth, and Richards, Layton & Finger is acting as legal advisor to the Genworth Board of Directors. Citi and Willis Capital Markets & Advisory are acting as financial advisors to China Oceanwide and Sullivan & Cromwell and Potter Anderson & Corroon LLP are acting as legal advisors to China Oceanwide.

**<u>The Preclusive Deal Protection Measures</u>**

35. The Merger Agreement favor Asia Pacific and is calculated to dissuade potential suitors from submitting competing offers.

36. For example, Section 6.2 of the Merger Agreement contains a "no solicitation" provision whereby the Company may not solicit, initiate, endorse, knowingly encourage or knowingly facilitate alternative acquisition proposals with other potential acquirers for the Company. Section 6.2(a) states:

> The Company agrees that, except as expressly permitted by this Section 6.2, neither it nor any of its Subsidiaries nor any of the officers and directors of it and its Subsidiaries shall, and the Company shall use its reasonable best efforts to cause its and its Subsidiaries' employees, investment bankers, attorneys, accountants and other advisors or representatives (such directors, officers, employees, investment bankers, attorneys, accountants and other advisors or representatives, collectively, "Representatives") not to, directly or indirectly, nor shall it authorize any of the officers and directors of it or its Subsidiaries to (subject to the terms of the provisos in the definition of "Subsidiary" in Article X):
>
> (i) initiate, solicit or knowingly encourage any inquiries or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, any Acquisition Proposal;
>
> (ii) engage in or otherwise participate in any discussions or negotiations regarding an Acquisition Proposal, or provide any non-public information or data to any Person that has made, or to the Knowledge of the Company is reasonably likely to make or is considering (in each case whether alone or as part of a group), an Acquisition Proposal, except to notify such Person of the existence of the provisions of this Section 6.2;
>
> (iii) take any action to exempt any Third Party from the restrictions on "business combinations" contained in Section 203 of the DGCL or any other applicable Takeover Statute or otherwise cause such restrictions not to apply; or
>
> (iv) otherwise knowingly facilitate any effort or attempt to make an Acquisition Proposal;

> provided, that notwithstanding the foregoing or anything else in this Agreement to the contrary, the Company may waive, and may choose not to enforce, any provision of any standstill or confidentiality agreement with any Person that would prohibit such Person from communicating confidentially an Acquisition Proposal to the Company Board.
>
> Notwithstanding anything in this Agreement to the contrary, prior to but not after the time the Requisite Company Vote is obtained, the Company may, after complying with the notice obligation set forth in the first sentence of Section 6.2(g), (1) provide information and data in response to a request therefor by a Person who has made an unsolicited written Acquisition Proposal that the Company Board reasonably believes to be credible if the Company receives from the Person so requesting such information or data an executed confidentiality agreement on terms relating to confidentiality not less restrictive to the other party than those contained in the Confidentiality Agreements (provided that, such executed confidentiality agreement need not prohibit the making, or amendment, of any Acquisition Proposal to the Company), and promptly discloses (and, if applicable, provides copies of) any such information and data to Parent to the extent not previously provided to Parent; or (2) engage in or otherwise participate in any discussions or negotiations with any Person who has made such an unsolicited written Acquisition Proposal, if and only to the extent that, prior to taking any action described in clause (1) or (2) above, the Company Board determined in good faith after consultation with its financial advisor and outside counsel, that such action is reasonably necessary in order for the Company's directors to comply with their fiduciary duties under applicable Law.

37. In addition, pursuant to § 6.2(g) of the Merger Agreement, Asia Pacific has the right to be promptly (within 48 hours) notified by the Company if any inquiries, proposals or offers with respect to a competing acquisition proposal (and any changes thereto) are received by, any information or data in connection with a competing proposal is requested from, or any discussions or negotiation in connection with a competing proposal are sought to be initiated or continued with, the Company or any of its representatives, "indicating, in connection with such notice, the name of such Person and the material terms and conditions of any proposals or offers

(including, if applicable, copies of any written requests, proposals or offers, including proposed agreements). Thereafter, the Company will keep Asia Pacific reasonably informed, on a prompt basis, of the status and terms of any such proposals or offers (including any amendments thereto) and the status of any such discussions or negotiations, including any change in the Company's intentions as previously notified."

38. Lastly, the Board ability to change its recommendation concerning the Proposed Transaction is severely limited by the Merger Agreements unlimited matching rights. More specifically, the Merger Agreement provides Asia Pacific with information rights and recurring and unlimited matching rights, including: (i) unfettered access to confidential, nonpublic information about competing proposals from third parties which it can use to prepare a matching bid; and (ii) five (5) business days to negotiate with Asia Pacific to amend the terms of the Merger Agreement and make a counter-offer in the event a superior offer is received. Moreover, if the competing proposal is modified in response to a matching/superior revised bid by Asia Pacific, Asia Pacific is entitled to a new notice and matching rights period of three (3) business days, and new notice and matching rights period of one (1) business day. Moreover, Section 6.3(c) requires the Company to notify Asia Pacific within 24 hours that it has received an inquiry, proposal or offer.

39. In the highly unlikely event that a third-party bidder is not deterred by the mere existence of such onerous terms unfairly benefiting the acquirers and the Company's current management and does provide a superior competing offer, the Merger Agreement further provides that the Company shall pay Asia Pacific a termination fee of $105 million.

40. As such, any competing bidder will have to pay this $105 million bald premium in order to match the inadequate Offer Price. Thus, this deal protection device on its own

unreasonably deters alternative bidders from making a superior proposal to adequately compensate the Company's shareholders.

41. These deal protection provisions, taken together, erect barriers to competing offers and virtually guarantee that the Proposed Transaction will be consummated, leaving the Board and Genworth stockholders with an unfairly limited opportunity to receive or consider any superior offer. When viewed collectively, these provisions cannot be justified as reasonable or proportionate measures to protect Asia Pacific's investment in the transaction process.

42. Having failed to maximize the sale price for the Company, the Individual Defendants have breached the fiduciary duties they owe to plaintiff and the Company's public stockholders. The Company has been improperly valued and stockholders will not receive adequate or fair value for their Genworth common stock in the Proposed Transaction. Further, the Board failed to employ any real procedural protections for stockholders who had no one to bargain on their behalf.

43. Unless enjoined by this Court, Defendants will continue to breach and/or aid the breaches of fiduciary duties owed to plaintiff and the Class, and may consummate the Proposed Transaction resulting in irreparable harm of the Class when Asia Pacific purchases Genworth.

44. Plaintiff and the other members of the Class have no adequate remedy at law.

**The Sales Process is Flawed**

45. The single-bidder process that led to the Merger Agreement favored China Oceanwide and Company insiders.

46. In February 2015, the Company commenced an auction process to sell all or part of its U.S. life insurance and annuity businesses excluding the LTC insurance business (the "L&A businesses") ("Life and Annuity Transaction").

47. In April 2015, the Company received seven preliminary proposals to acquire all or portions of its L&A business from parties referred to in the Proxy as Company A, Company C, Company D, and four other bidders.

48. On April 14, 2015, Company B contacted Mr. Joseph Pehota ("Pehota"), the Company's Senior Vice President–Corporate Development, to discuss a potential transaction with the Company.

49. On April 21, 2015, Genworth and Company B entered into a confidentiality agreement that contained a standstill provision restricting Company B from taking certain actions with respect to Genworth's equity securities unless invited to do so by the Board.

50. On May 4, 2015, Company B submitted a written indication of interest to acquire Genworth for $12.50 per share. On June 15, 2015, Company B reduced its potential offer price to $10-$11 per share.

51. In May 2015, China Oceanwide's financial advisor contacted McInerney indicating China Oceanwide's interest in a potential transaction with Genworth.

52. On July 1, 2015, Company B withdrew its proposal and instead proposed to purchase Genworth's U.S. life insurance business ("L&A and LTC Transaction"). The Company's Board directed management to terminate discussions with Company B.

53. Companies A, C, and D also indicated interest in the L&A and LTC Transaction. Throughout the remainder of 2015 and through September 2016, Genworth held numerous meetings and discussions with Company A, during which Company A repeatedly submitted proposals to acquire the Company's L&A businesses and its LTC insurance business. Company A submitted its most recent proposal on September 16, 2016 to acquire Genworth's L&A

businesses for approximately $1.22 billion; however, Genworth declined to proceed with this transaction.

54. On February 5, 2016, China Oceanwide submitted a preliminary indication of interest to purchase all of Genworth's outstanding stock for an aggregate purchase price of $3 billion, or approximately $6.03 per share. Thereafter, China Oceanwide stated that it "expected to retain Genworth's management team and to rely on them to operate the business."

55. On February 17, 2016, Company D submitted a proposal to the Company's Board providing two options: (a) for Company D to acquire all outstanding shares of Genworth for $3.50 per share, a premium of approximately 95% to the $1.79 per share closing price of Genworth's common stock on February 16, 2016; and (b) for Company D to make a $750 million preferred equity investment in Genworth, secured by a lien on the shares of Genworth's U.S. mortgage insurance holding company. Thereafter, Genworth negotiated confidentiality agreements that included standstill provisions with each of Company D and China Oceanwide that were executed on March 3, 2016, and March 4, 2016, respectively. These details are not disclosed in the Proxy. Despite having received interest in an acquisition of the entire Company from Company B and Company D, the Company's Board failed to pursue a transaction with either party or engage the market in a value-maximizing process for the entire Company.

56. On March 17, 2016, the Company's Board established the Strategic Transaction Committee (the "STC"), which was comprised of undisclosed independent directors, to review potential strategic transactions.

57. On May 11, 2016, the Company's Board appointed an additional undisclosed independent director as an alternate member of the STC.

58. On June 15, 2016, China Oceanwide delivered a revised proposal to the Company's financial advisors lowering its purchase price to $5.43 per share.

59. On August 3, 2016, Genworth's stock rebounded and increased from $2.75 per share to $5.21 per share on October 21, 2016.

60. Between September 28 and September 30, 2016, Riepe and McInerney and other members of Genworth management held meetings in Beijing with President and Chairman of China Oceanwide, Lu Zhiqiang ("Lu"), and Xiaoxia Zhao ("Zhao"), President and CEO of China Oceanwide's insurance group. Despite the Company's increase in stock price, China Oceanwide refused to increase its proposed $5.43 per share proposal, which represented a mere 9.5% premium to the $4.96 per share closing price of Genworth's common stock on September 30, 2016.

61. On August 1, 2016, Riepe and McInerney discussed with Zhao and Xuan Wang ("Wang"), a Vice President of China Oceanwide's insurance group, that the Company's Board was considering an alternative transaction for the sale of the Company's L&A businesses, which the Board considered more likely to be consummated than the merger with China Oceanwide.

62. On August 26, 2016, Genworth provided projections to S&P's Ratings Evaluation Service. Genworth provided S&P's Ratings Evaluation Service with updated projections on September 28, 2016.

63. On September 16, 2016, Company A submitted a proposal to acquire Genworth's L&A businesses for approximately $1.22 billion.

64. On September 16, 2016, Genworth provided China Oceanwide with the Company's September projections.

65. On September 25, 2016, Genworth management presented the September projections to the Company's Board.

66. On October 9, 2016, Genworth management presented a revised version of the September projections to the Company's Board.

67. On October 13 and October 14, 2016, the Company management presented a further revised version of the September projections to the Company Board. Despite outstanding interest from Company A in the acquisition of its L&A businesses, the Company Board determined to proceed with a transaction with China Oceanwide. Thereafter, on October 20, 2016, Goldman and Lazard delivered their fairness opinions to the Board and the Board determined that the terms of the Merger Agreement were acceptable.

68. On October 21, 2016, the Board approved the Merger Agreement and the parties subsequently executed the Merger Agreement.

**Insiders' Interests in the Merger**

69. China Oceanwide and Genworth insiders are the beneficiaries of the Merger, not the Company's public stockholders. The Company's Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Merger which are not available to Plaintiff and the Class.

70. McInerney and Company management have secured positions for themselves with China Oceanwide. Pursuant to the October 22, 2016 press release announcing the Merger:

> "Upon the completion of the transaction, Genworth will be a standalone subsidiary of China Oceanwide and Genworth's senior management team will continue to lead the business from its current headquarters in Richmond, Virginia."

71. In addition, the Company insiders will reap a financial windfall for securing the deal with China Oceanwide. According to the Merger Agreement, Genworth's directors and

officers will receive cash payments from the accelerated vesting of all outstanding equity awards, as set forth in the following table:

| Name | Vested DSUs (#) | Vested DSUs (2) ($) | Unvested RSUs(#) (3) | Unvested RSUs($) (3) | Unvested PSUs(#) (4) | Unvested PSUs($) (4) | Total($) |
|---|---|---|---|---|---|---|---|
| *Executive Officers* (5) | | | | | | | |
| Thomas J. McInerney | — | $ — | — | $ — | 1,583,333 | $ 8,597,498 | $ 8,597,498 |
| Kelly L. Groh | — | $ — | 141,612 | $ 768,953 | 180,000 | $ 977,400 | $ 1,746,353 |
| Kevin D. Schneider | — | $ — | 269,999 | $ 1,466,095 | 452,500 | $ 2,457,075 | $ 3,923,170 |
| Daniel J. Sheehan IV | — | $ — | 234,999 | $ 1,276,045 | 333,333 | $ 1,809,998 | $ 3,086,043 |
| Michael S. Laming | — | $ — | 94,201 | $ 511,511 | 152,500 | $ 828,075 | $ 1,339,586 |
| *All Other Executive Officers as a Group (3 individuals)* | — | $ — | 231,596 | $ 1,257,566 | 394,999 | $ 2,144,845 | $ 3,402,411 |
| *Non-Employee Directors as a Group (10 individuals)* (6) | 972,137 | $ 5,278,705 | — | $ — | — | $ — | $ 5,278,705 |

72. In addition, if the Company insiders are terminated in connection with the Merger, the Company's named executive officers are set to receive substantial cash payments in the form of golden parachute compensation:

| Name | Cash (1) | Equity (2) | Pension/ NQDC (3) | Perquisites/ Benefits (4) | Other (5) | Total |
|---|---|---|---|---|---|---|
| Thomas J. McInerney *President and Chief Executive Officer* | $ 8,500,000 | $ 4,524,998 | $ 291,410 | $ 39,717 | $ — | $ 13,356,125 |
| Kelly L. Groh *Executive Vice President and Chief Financial Officer* | $ 2,475,000 | $ 1,257,653 | $ 1,004,516 | $ 21,797 | $ — | $ 4,758,966 |
| Kevin D. Schneider *Executive Vice President and Chief Operating Officer* | $ 4,168,750 | $ 2,932,195 | $ 3,755,869 | $ 40,356 | $ 1,000,000 | $ 11,897,170 |
| Michael S. Laming *Executive Vice President, Human Resources* | $ 2,000,000 | $ 515,850 | $ — | $ 16,095 | $ — | $ 2,531,945 |
| Daniel J. Sheehan IV *Executive Vice President and Chief Investment Officer* | $ 3,825,000 | $ 2,339,418 | $ 3,058,731 | $ 30,719 | $ 1,000,000 | $ 10,253,868 |

**<u>There are Material Misstatements or Omissions in the Proxy</u>**

73. On December 21, 2016, Defendants filed a misleading Proxy with the SEC and disseminated it to the Company's stockholders. The Proxy misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Merger.

74. As set forth below, the Proxy does not provide Company stockholders with material information concerning: (i) the Company's management's projections used by Goldman Sachs and Lazard in their financial analyses; (ii) the valuation analyses prepared by Goldman Sachs and Lazard in connection with the rendering of their fairness opinions; and (iii) the sale process leading up to the Proposed Transaction. In short, Genworth stockholders are being asked to vote for a Merger without all material information at their disposal.

**<u>The Company's Financial Projections</u>**

75. The Proxy lacks material information relating to the Company's intrinsic value and prospects going forward.

76. For example, the "Summary of Genworth's Management Base Forecast" (see page 89 of the Proxy) fails to disclose the financial projections provided by the Company's management and relied upon by Goldman Sachs and Lazard in conducting their analyses for fiscal years 2016-2021 for the following items: (a) GAAP Equity; (b) GAAP Equity, excluding AOCI; (c) GAAP Net operating earnings; (d) Total GAAP Operating Expenses; (e) Statutory net income (loss) attributable to Genworth; (f) Book value per share, excluding AOCI; and (g) Net operating loss carryforward balances and utilization.

77. Moreover, the Proxy provides projections for Non-GAAP Leverage Ratio, but does not provide line item projections for the metrics used to calculate this non-GAAP measure.

78. Further, regarding the sum-of-the parts discounted cash flow analyses, Goldman Sachs and Lazard relied on management projections for the following segments of Genworth: (a) U.S. Life, including the L&A businesses and LTC insurance business ("U.S. Life"); (b) US MI; (c) Genworth Australia; and (d) Genworth corporate and other assets ("Corporate and Other"). However, the Proxy does not disclose the financial projections for each of the segments for years 2016-2021.

79. Lastly, pursuant to the Proxy, the Company's management presented "September projections" to the Company's Board at the September 25, 2016 Board meeting. The Company's Management presented a revised set of September projections to the Company's Board at its October 9, 2016 Board meeting. The Company's Management revised the September projections a third time, and presented a "Base Forecast" to the Company's Board at its October 13 and 14, 2016 meetings. Although the Company's Management revised its projections twice near the end of negotiations with China Oceanwide, the Proxy does not disclose the September projections provided to the Company's Board at its September 25 and October 9, 2016 Board meetings.

80. These omissions render the following statements in the Proxy materially misleading in contravention of the Exchange Act:

(a) Page 89 of the Proxy states:

> The following table summarizes the Base Forecast prepared by Genworth's management as described above:

Financial Metrics

| ($ in millions, unless per share amounts) | Projected Fiscal Year 2016E | 2017E | 2018E | 2019E | 2020E | 2021E |
|---|---|---|---|---|---|---|
| **Non-GAAP Operating Earnings (Loss) per Share** | $ (0.41) | $ 0.68 | $ 0.66 | $ 0.81 | $ 0.96 | $ 0.98 |
| **Non-GAAP Operating Return on Equity ("ROE")** | (2.2)% | 3.8% | 3.6% | 4.2% | 4.8% | 4.7% |
| **Book Value Per Share** | $ 17.72 | $ 18.23 | $ 18.73 | $ 19.52 | $ 20.40 | $ 21.36 |
| **Cash Flow Coverage (1)** | 0.8 | 0.6 | 1.1 | 0.9 | 0.8 | 0.7 |
| **Non-GAAP Leverage Ratio** | 25.8% | 18.2% | 17.9% | 19.3% | 17.7% | 13.9% |
| **MI Dividends (2)** | $ 222 | $ 424 | $ 209 | $ 187 | $ 167 | $ 128 |
| **Holding Company Cash ($ in billions)** | $ 1.5 | $ 0.4 | $ 0.4 | $ 0.9 | $ 0.8 | $ 0.3 |
| **Holding Company Debt ($ in billions)** | $ 3.8 | $ 2.3 | $ 2.3 | $ 2.7 | $ 2.5 | $ 1.9 |
| **Debt to Capital Ratio** | 31% | 23% | 22% | 24% | 22% | 17% |

(1) Cash Flow Coverage means the difference of the aggregate dividends paid to Genworth Holdings from Genworth Holdings' subsidiaries less cash contributed by Genworth Holdings to its subsidiaries in the same period, divided by interest expense and estimated corporate overhead costs of Genworth Holdings that are not reimbursed by such subsidiaries. The 2016 Cash Flow Coverage metric excludes the $175 million cash contribution from Genworth Holdings to GLIC to facilitate the unstacking. Including this $175 million cash contribution from Genworth Holdings to GLIC would make the 2016 Cash Flow Coverage 0.2. The 2017 Cash Flow Coverage metric excludes a $300 million dividend paid by US MI to Genworth Holdings from the proceeds of an assumed debt issuance by US MI. Including this $300 million dividend from US MI to Genworth Holdings would make the 2017 Cash Flow Coverage 2.3. Cash Flow Coverage is an operating measure that is not defined by GAAP and all of the inputs are calculated in accordance with GAAP. Accordingly Cash Flow Coverage is not a non-GAAP financial measure.

(2) MI Dividends reflects the projected dividends for each of Genworth Australia, US MI, and in the case of fiscal 2016 only, Genworth Canada, in the aggregate. The Base Forecast assumes there will be no dividends from U.S. Life to Genworth Holdings during the forecast period. The projected dividends for 2017E include a $300 million dividend paid by US MI to Genworth Holdings from the proceeds of an assumed debt issuance by US MI.

(b) Pages 86-87 of the Proxy states:

> The September projections were reviewed with the Board at its September 25, 2016 meeting. Genworth's management also reviewed with the Board at that time its preliminary risk assessment of the September projections. Among other things, the September projections presented to the Board did not include any future provisions for a number of risks, including further incremental LTC insurance claims deterioration, lower interest rates or any increase in asset capital charges from changes in regulatory capital requirements. Genworth's management also reviewed with the Board potential upside opportunities associated with the September projections, including the positive effects of gradually rising interest rates, equity market increases and larger LTC rate actions than those contemplated in the then current multi-year rate action plan.
>
> At the September 25, 2016 Board meeting and subsequent meetings, the directors asked questions of Genworth's management with respect to the September projections and subsequent iterations thereof prepared by management between September 26, 2016 and October 14, 2016, as well as the various assumptions presented to the Board at those meetings. In particular, at the October 9, 2016 meeting of the Board, the Board commented that management's assumptions regarding projected interest rates and S&P equity market index levels for the forecasted period appeared to be more conservative than those of independent economists, and the Board recommended that management further revise the September projections to use more current forecasts generated by independent

> economists for both interest rates and S&P equity market index levels. After these discussions, changes were made to a number of the assumptions used in the preparation of the September projections, including less conservative assumptions relating to future interest rates but also potential ratings downgrades and the related impact on US MI's market share. Specifically, an estimated tax valuation allowance of $300 million and the potential increase in LTC insurance claim reserves that could be recorded in the third quarter were assumed to result in a subsequent downgrading by S&P of Genworth Holdings; additionally, US MI's S&P ratings were assumed to be downgraded by one or two notches, with a resulting negative impact on US MI's market share and the assumed future interest rates were increased to reflect then-current interest rates and certain third party estimates. Further, at the meeting of the Board on October 13, 2016 and October 14, 2016 (for further description of this meeting see the section entitled "—Background of the Merger," beginning on page 30), Genworth's management summarized for the Board certain updates management had made to assumptions underlying the previous version of the September projections presented to the Board at the October 9, 2016 Board meeting based on discussions and input received from the Board at that meeting. A discussion ensued during which the directors asked questions of management concerning the assumptions underlying the revised projections. Following discussion, the Board determined that management's assumptions for S&P equity market index levels and risks continued to appear to be more conservative than those of independent economists, and the Board recommended that management further revise those assumptions to use more current forecasts for the S&P equity market index levels. Genworth's management confirmed that these forecasts would be updated accordingly. As a result, following the October 13-14, 2016 meeting of the Board, the September projections were further revised by management to increase the S&P equity market index level to its then-current level. The resulting set of financial projections for the fiscal years ended December 31, 2016 through 2021 is referenced in this proxy statement as the "Base Forecast."

**<u>Goldman Sachs' and Lazard's Financial Analyses Contain Material Omissions</u>**

81. The Proxy sets forth Goldman Sachs' and Lazard's fairness opinions and various valuation analyses performed in support of their opinions. However, Goldman Sachs' and Lazard's fairness opinions and analyses fail to include key inputs and assumptions underlying these analyses. Without this information, the Company's public stockholders are unable to fully understand these analyses and are unable to determine what weight to place on Goldman Sachs' and Lazard's fairness opinions in determining whether to vote in favor of the Merger. This

omitted information would significantly alter the total mix of information available to the Company's shareholders.

82. The Proxy does not disclose various material elements of the financial analysis performed by Goldman Sachs. For example, Goldman Sachs' *Present Value of Future Share Price Analysis* fails to disclose: (a) the individual multiples for each of the selected public companies analyzed by Goldman Sachs, as well as any benchmarking analyses Goldman Sachs performed for the Company in relation to the selected public companies; and (b) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate of 20.1%.

83. Further, Goldman Sachs' *Illustrative Sum-of-the-Parts Analysis* fails to disclose:

(i) with respect to U.S. Life, (a) Goldman Sachs' basis for applying price to book value multiples ranging from 0.20x to 0.30x, (b) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate range of 11.0% to 13.0%, and (c) the projected book value per share of U.S. Life in 2020 as set forth in the Base Forecast utilized by Goldman Sachs in this analysis;

(ii) with respect to Goldman Sachs' illustrative dividend discount analysis with respect to US MI, (a) Goldman Sachs' basis for applying one-year forward P/E multiples ranging from 8.0x to 10.0x, (b) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate range of 11.0% to 13.0%, (c) the estimated 2021 earnings per share for US MI as set forth in the Base Forecast utilized by Goldman Sachs in this analysis, and (d) the estimated dividend streams from the Company's assumed 80.1% ownership in US MI for the period 2017 through 2020 as set forth in the Base Forecast utilized by Goldman Sachs in this analysis;

(iii) with respect to Goldman Sachs' illustrative trading range analysis for US MI, (a) Goldman Sachs' basis for applying P/E multiples ranging from 8.2x to 8.6x, and (b) estimated 2017 earnings for US MI as set forth in the Base Forecast utilized by Goldman Sachs in this analysis;

(iv) with respect to Genworth Australia, (a) Goldman Sachs' basis for applying one-year forward P/E multiples ranging from 7.0x to 9.0x, (b) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate range of 11.0% to 13.0%, and (c) the estimated 2021 earnings per share for Genworth Australia as set forth in the Base Forecast utilized by Goldman Sachs in this analysis;

(v) with respect to Corporate and Other, (a) Genworth Holdings' cash (excluding restricted cash) and debt valued at book value as provided by Genworth management (including estimates for the cash proceeds to Genworth Holdings from the assumed sale of its 57.3% stake in Genworth Canada, a one-time dividend paid by US MI to Genworth Holding from the proceeds of an assumed debt issuance by US MI and cash proceeds to Genworth Holdings from its assumed sale of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017) utilized by Goldman Sachs in its analysis, (b) the net present value of certain net deferred tax assets utilized by Goldman Sachs in its analysis, (c) the net present value as of December 31, 2017, of certain net accrued Genworth liabilities utilized by Goldman Sachs in its analysis, and (d) the estimated dividend streams from Genworth's 52% ownership in Genworth Australia for the period 2017 through 2020 as set forth in the Base Forecast utilized by Goldman Sachs in this analysis; and

(vi) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate of 20.1%.

84. The Proxy also does not disclose various material elements of the financial analysis performed by Lazard. Lazard's *Selected Companies Analysis* does not disclose: (i) the individual multiples for each of the selected public companies analyzed by Lazard or, at the very least, the low, high, median and mean multiples observed by Lazard, as well as any benchmarking analyses Lazard performed for the Company in relation to the selected public companies; (ii) the 2017 and 2018 return on average equity set forth in the Base Forecast utilized by Lazard in this analysis; and (iii) the estimated 2017 book value per share (ex. AOCI) of the Company (based on the Base Forecast) utilized by Lazard in this analysis. Without this omitted information, Genworth shareholders have no way of determining whether the multiples applied by Lazard were appropriate when compared to the multiples observed for the selected companies, and thus, have no way of determining whether the implied per share reference ranges accurately reflect the value of their shares.

85. In addition, Lazard's *Sum-of-the-Parts Analysis* fails to disclose:

(i) with respect to U.S. Life, (a) Lazard's basis for applying price to book value (ex. AOCI) multiples ranging from 0.20x to 0.30x, (b) Lazard's basis for applying terminal value multiples ranging from 5.6x to 8.4x, (c) the individual inputs and assumptions utilized by Goldman Sachs to derive the discount rate range of 10.0% to 12.0%, (d) the projected book value (ex. AOCI) of U.S. Life in 2020 as set forth in the Base Forecast utilized by Lazard in this analysis, and (e) the estimate of fiscal year 2021 operating income as set forth in the Base Forecast utilized by Lazard in this analysis;

(ii) with respect to US MI, (a) Lazard's basis for applying one-year forward P/E multiples ranging from 8.0x to 10.0x, (b) the individual inputs and assumptions utilized by Lazard to derive the discount rate ranges of 8.5% to 10.0% and 10.0% to 12.0%, (c) estimated fiscal year 2021 operating earnings for US MI as set forth in the Base Forecast utilized by Lazard in this analysis, and (d) the estimated dividend streams from Genworth's assumed 80.1% ownership in US MI for the period 2017 through 2020 as set forth in the Base Forecast utilized by Lazard in this analysis;

(iii) with respect to Genworth Australia, (a) Lazard's basis for applying one year forward P/E multiples ranging from 7.0x to 9.0x, (b) the individual inputs and assumptions utilized by Lazard to derive the discount rate ranges of 9.0% to 10.5% and 10.0% to 12.0%, (c) estimated fiscal year 2021 operating earnings for Genworth Australia as set forth in the Base Forecast utilized by Lazard in this analysis, and (d) the estimated dividend streams from Genworth's 52% ownership in Genworth Australia for the period 2017 through 2020 as set forth in the Base Forecast utilized by Lazard in this analysis;

(iv) with respect to Corporate and Other, (a) Genworth Holdings' cash (excluding restricted cash) and debt valued at book value as provided by Genworth management (including estimates for the cash proceeds to Genworth Holdings from the assumed sale of its 57.3% stake in Genworth Canada, a one-time dividend paid by US MI to Genworth Holding from the proceeds of an assumed debt issuance by US MI and cash proceeds to Genworth Holdings from its assumed sale of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017) utilized by Lazard in its analysis, (b) the net present value of certain net deferred tax assets utilized

by Lazard in its analysis, and (c) the net present value as of December 31, 2017, of certain net accrued Genworth liabilities utilized by Lazard in its analysis; and

(v) the individual inputs and assumptions utilized by Lazard to derive the discount rate of 19.7%.

86. These omissions render the following statements in the Proxy false and/or materially misleading:

(a) Pages 74-76 of the Proxy states:

> *Present Value of Future Share Price Analysis*. Goldman Sachs performed analyses of the implied present value of the future share price of Genworth common stock, which is designed to indicate the present value of a theoretical future value of Genworth's equity as a function of its estimated future book value per share and an assumed range of price to book value multiples. For these analyses, Goldman Sachs used the Base Forecast for the one year periods ending December 31 of each of the years 2018 through 2021 and the number of fully diluted outstanding shares of Genworth as of December 31 of each of the years 2017 through 2020 as provided by Genworth's management. Goldman Sachs first performed a regression analysis to compare the implied relationship between reported price as a multiple of book value per share (excluding accumulated other comprehensive income, which we refer to as "ex. AOCI", and, collectively, as the "P/BV (ex. AOCI) ") as of June 30, 2016 and the estimated return on average equity for 2017 (which we refer to as the "2017E ROAE") for the following publicly traded companies using estimates from Institutional Brokers' Estimate System (which we refer to as "IBES") for these selected companies:
>
> - Metlife, Inc.
> - Prudential Financial, Inc.
> - Ameriprise Financial, Inc.
> - Principal Financial Group, Inc.
> - Lincoln National Corporation
> - Unum Group
> - Torchmark Corporation
> - VOYA Financial, Inc.
> - CNO Financial Group, Inc.
> - Primerica, Inc.
> - FBL Financial Group, Inc.
> - American Equity Investment Life Holding Company
>
> Although none of the selected companies is directly comparable to Genworth or has exposure to the LTC sector that is as significant as Genworth's, the selected

companies included were chosen because they are publicly traded companies with operations that, for purposes of analysis, may be considered similar to certain operations of Genworth.

The regression analysis for the selected companies produced an R-squared value of 0.7959. Goldman Sachs applied this general relationship to Genworth's estimated return on average equity for each of the years 2018 through 2021 as reflected in the Base Forecast and calculated implied present values per share of Genworth common stock by assuming Genworth trades on the regression line (0.0% discount) and by applying the current discount at which Genworth trades to the regression line (28.4% discount). The regression analyses implied the following P/BV (ex. AOCI) multiples for each of the years 2017 through 2020 on the regression line versus P/BV (ex. AOCI) multiples after applying the discount for each of the years 2017 through 2020:

| | Implied P/BV | Implied P/BV at Current Discount |
|---|---|---|
| 2017E | 0.43x | 0.31x |
| 2018E | 0.49x | 0.35x |
| 2019E | 0.55x | 0.40x |
| 2020E | 0.54x | 0.39x |

The estimated P/BV multiples for each of the years 2017 through 2020 implied by applying the current discount were then applied to estimated book value per share of Genworth as set forth in the Base Forecast for each of the years 2017 through 2020 to derive a range of implied future stock prices for Genworth for each of 2017 through 2020, which Goldman Sachs then discounted back to present value, using an illustrative discount rate of 20.1%, reflecting an estimate of Genworth's cost of equity. This analysis resulted in an illustrative range of implied present values per share of Genworth common stock of $3.80 to $4.66.

*Illustrative Sum-of-the-Parts Analysis*. Goldman Sachs performed an illustrative sum-of-the-parts analysis of Genworth to derive implied values as of January 1, 2017 for each of the following segments of Genworth:

- U.S. Life, including the L&A businesses and LTC insurance business (which we refer to as "U.S. Life")
- US MI
- Genworth Australia
- Genworth corporate and other assets (which we refer to as "Corporate and Other")

Goldman Sachs performed illustrative dividend discount analyses for U.S. Life, US MI and Genworth Australia to derive a range of implied values for each such segment. In addition, Goldman Sachs also performed an illustrative trading range analysis for US MI.

In performing an illustrative dividend discount analysis with respect to U.S. Life, Goldman Sachs calculated a range of illustrative terminal values for U.S. Life in 2020 by applying illustrative price to book value multiples ranging from 0.20x to 0.30x to the projected book value per share of U.S. Life in 2020 as set forth in the Base Forecast. Goldman Sachs then discounted the estimated dividend streams from U.S. Life for the period 2017 through 2020 as set forth in the Base Forecast (which were $0 for such period) and the range of illustrative terminal values to derive illustrative present values, as of January 1, 2017, of U.S. Life, which ranged from $888 million to $1.431 billion. Goldman Sachs used a range of discount rates from 11.0% to 13.0%, representing estimates of Genworth's weighted average cost of capital.

In performing an illustrative dividend discount analysis with respect to US MI, Goldman Sachs calculated a range of illustrative terminal values for Genworth's assumed 80.1% ownership stake in US MI (pro forma for the assumed sale by Genworth of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017, as reflected in the Base Forecast) in 2020 by applying one-year forward P/E multiples ranging from 8.0x to 10.0x to estimated 2021 earnings per share for US MI as set forth in the Base Forecast. Goldman Sachs then discounted the estimated dividend streams from Genworth's assumed 80.1% ownership in US MI for the period 2017 through 2020 as set forth in the Base Forecast and range of illustrative terminal values to derive illustrative present values, as of January 1, 2017, of Genworth's assumed 80.1% ownership stake in US MI. Goldman Sachs used a range of discount rates from 11.0% to 13.0%, representing estimates of Genworth's weighted average cost of capital. Goldman Sachs also performed an illustrative trading range analysis for US MI. In performing an illustrative trading range analysis for US MI, Goldman Sachs derived a range of implied values for Genworth's assumed 80.1% ownership stake in US MI, by applying estimated P/E multiples ranging from 8.2x to 8.6x to estimated 2017 earnings for US MI as set forth in the Base Forecast. These analyses resulted in a valuation range for US MI from $1.285 billion to $1.660 billion.

In performing an illustrative dividend discount analysis of Genworth Australia, Goldman Sachs calculated a range of illustrative terminal values for Genworth's 52% ownership stake in Genworth Australia in 2020 by applying one-year forward P/E exit multiples ranging from 7.0x to 9.0x to estimated 2021 earnings per share for Genworth Australia as set forth in the Base Forecast. Goldman Sachs then discounted the estimated dividend streams from Genworth's 52% ownership in Genworth Australia for the period 2017 through 2020 as set forth in the Base Forecast and illustrative terminal values to derive illustrative present values, as of January 1, 2017, of Genworth's 52% ownership stake in Genworth Australia, which ranged from $477 million to $548 million. Goldman Sachs used a range of discount rates from 11.0% to 13.0%, representing estimates of Genworth's weighted average cost of capital.

Goldman Sachs also derived an implied value for Corporate and Other, which resulted in an implied valuation of $(1.266 billion), using the following data provided by Genworth's management: (i) pro forma estimates, as of January 1, 2017, of Genworth Holdings' cash (excluding restricted cash) and debt valued at book value as provided by Genworth management (including estimates for the cash proceeds to Genworth Holdings from the assumed sale of its 57.3% stake in Genworth Canada, a one-time dividend paid by US MI to Genworth Holding from the proceeds of an assumed debt issuance by US MI and cash proceeds to Genworth Holdings from its assumed sale of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017), (ii) the net present value of certain net deferred tax assets as of December 31, 2016 (valued using a discount rate of 11.6%, representing an estimate of Genworth's weighted average cost of capital, using the estimated utilization of such tax assets reflected in the Base Forecast) and (iii) the net present value as of December 31, 2017, of certain net accrued Genworth liabilities (valued using a discount rate of 11.6%, representing an estimate of Genworth's weighted average cost of capital, using the estimated net payment of such liabilities reflected in the Base Forecast). Goldman Sachs added together the ranges of implied values it derived using the foregoing analyses to derive a range of implied equity values for Genworth, divided the result by the number of Genworth fully diluted shares outstanding provided by Genworth management and then discounted the implied values per share of Genworth common stock from January 1, 2017 to September 30, 2016 using a discount rate of 20.1%, representing Genworth's estimated cost of equity, to derive a range of implied present values per share of Genworth common stock of $2.61 to $4.48.

(b) Pages 80-84 of the Proxy states:

*Selected Companies Analysis*. Lazard reviewed and analyzed certain financial information, valuation multiples and market trading data related to selected comparable publicly traded companies that operate in the life insurance and mortgage insurance business sectors, whose operations Lazard believed, based on its experience with companies in the life insurance and mortgage insurance business sectors and its professional judgment, to be generally relevant in analyzing Genworth's operations for purposes of this analysis. Lazard compared such information for the selected comparable companies to the corresponding information for Genworth. The group of selected companies in the life insurance sector used in this analysis with respect to Genworth was as follows:

- Metlife, Inc.
- Prudential Financial, Inc.
- Ameriprise Financial, Inc.
- Principal Financial Group, Inc.
- Lincoln National Corporation
- Unum Group

- Torchmark Corporation
- VOYA Financial, Inc.
- CNO Financial Group, Inc.
- Primerica, Inc.
- FBL Financial Group, Inc.
- American Equity Investment Life Holding Company

The group of selected companies in the mortgage insurance sector used in this analysis with respect to Genworth was as follows:

- Radian Group Inc.
- MGIC Investment Corporation
- Essent Group Ltd.
- NMI Holdings, Inc.

Lazard selected the companies reviewed in this analysis because, among other things, the selected companies operate businesses similar in certain respects to the business of Genworth. However, no selected company is identical to Genworth. In particular, none of the selected comparable companies has exposure to LTC insurance business that is as significant as Genworth's. Accordingly, Lazard believes that purely quantitative analyses are not, in isolation, determinative in the context of the merger and that qualitative judgments concerning differences between the business, financial and operating characteristics and prospects of Genworth and the selected companies that could affect the public trading values of each company are also relevant.

Lazard calculated and compared various financial multiples for each of the selected companies and Genworth based on estimates from IBES, including, among other things:

- closing price per share as of October 18, 2016, as a multiple of estimated 2017 earnings per share (which we refer to as "P/E 2017E");
- closing price per share as of October 18, 2016, as a multiple of estimated 2018 earnings per share (which we refer to as "P/E 2018E"); and
- closing price per share as of October 18, 2016, as a multiple of P/BV (ex. AOCI) as of June 30, 2016 (which we refer to as "2Q'2016 P/BV (ex AOCI)").

Lazard also conducted a regression analysis to measure the relationship between estimated return on average equity for 2017 and the ratio of P/BV (ex. AOCI) for the selected companies. Based on this analysis and assuming the current discount at which Genworth trades to the regression line (28.4% discount), Lazard noted that (i) the 2017 return on average equity set forth in the Base Forecast implied a ratio of P/BV per share for Genworth of 0.32x and (ii) the 2018 return on average equity set forth in the Base Forecast implied a ratio of P/BV per share for Genworth of 0.31x.

Based on the analyses summarized above and Lazard's professional judgment, including with respect to the comparability of the selected companies, Lazard selected a reference range (with the low end of each such range representing the multiple derived with respect to Genworth using IBES estimates) of:

- 5.5x to 8.6x for P/E 2017E;
- 5.4x to 7.7x for P/E 2018E;
- 0.26x to 0.32x for share price to adjusted 1 2Q'2016 book value per share (ex. AOCI); and
- 0.26x to 0.31x for share price to present value of estimated 2017 book value per share (ex. AOCI);

Lazard applied (i) each such range of P/E multiples to the estimated 2017 and 2018 earnings per share of Genworth (based on the Base Forecast) and (ii) each such range of P/BV multiples to reported adjusted 2Q'2016 book value per share (ex. AOCI) and estimated 2017 book value per share (ex. AOCI) of Genworth (based on the Base Forecast), which in the case of estimated 2017 book value per share (ex. AOCI), Lazard then discounted back to present value using a discount rate of 19.7%.

From this analysis, Lazard estimated an implied price per share reference range for shares of Genworth common stock as follows:

| | Implied Equity Valuation Range Low | Implied Equity Valuation Range High |
|---|---|---|
| P/E 2017E | $ 3.71 | $ 5.85 |
| P/E 2018E | $ 3.58 | $ 5.12 |
| Adjusted 2 2Q' 2016 P/BV (ex. AOCI) | $ 4.77 | $ 5.95 |
| Present Value of 2017E P/BV (ex. AOCI) | $ 3.87 | $ 4.67 |

Based on the foregoing results and Lazard's professional judgment, Lazard derived an implied price per share reference range for the Genworth common stock of $3.80 to $5.35.

*Sum-of-the-Parts Analysis*. Lazard performed a sum-of-the-parts analysis of Genworth to derive implied values for each of the following segments of Genworth:

- U.S. Life
- US MI
- Genworth Australia
- Corporate and Other (as further described below)

Lazard performed dividend discount analyses for U.S. Life, US MI and Genworth Australia to derive a range of implied values for each such segment.

In performing its dividend discount analysis with respect to U.S. Life, Lazard calculated a range of implied terminal values for U.S. Life in 2020 by applying (i) P/BV (ex. AOCI) multiples ranging from 0.20x to 0.30x to the projected book value (ex. AOCI) of U.S. Life in 2020 as set forth in the Base Forecast and (ii) a range of terminal value multiples of 5.6x to 8.4x to an estimate of fiscal year 2021 operating income as set forth in the Base Forecast. Lazard then discounted the estimated dividend streams from U.S. Life for the period 2017 through 2020 as set forth in the Base Forecast (which were $0 for such period) and the range of implied terminal values to derive implied present values, as of January 1, 2017, of U.S. Life, which ranged from $921 million to $1.484 billion. Lazard used a range of discount rates from 10.0% to 12.0%, representing estimates of Genworth's weighted average cost of capital.

In performing its dividend discount analysis with respect to US MI, Lazard calculated implied terminal values for Genworth's assumed 80.1% ownership stake in US MI (pro forma for the assumed sale by Genworth of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017 as reflected in the Base Forecast) in 2020 by applying one-year forward P/E multiples ranging from 8.0x to 10.0x to estimated fiscal year 2021 operating earnings for US MI as set forth in the Base Forecast. Lazard then discounted the estimated dividend streams from Genworth's assumed 80.1% ownership in US MI for the period 2017 through 2020 as set forth in the Base Forecast and implied terminal values to derive implied present values as of January 1, 2017 of Genworth's assumed 80.1% ownership stake in US MI. Lazard used a range of discount rates from 8.5% to 10.0%, representing estimates of US MI's cost of equity, which resulted in implied present values of Genworth's assumed 80.1% ownership stake in US MI ranging from $1.419 billion to $1.808 billion, and a range of discount rates from 10.0% to 12.0%, representing estimates of Genworth's weighted average cost of capital, which resulted in implied present values of Genworth's assumed 80.1% ownership stake in US MI ranging from $1.328 billion to $1.717 billion.

In performing its dividend discount analysis of Genworth Australia, Lazard calculated implied terminal values for Genworth's 52% ownership stake in Genworth Australia in 2020 by applying one-year forward P/E multiples ranging from 7.0x to 9.0x to estimated fiscal year 2021 operating earnings for Genworth Australia as set forth in the Base Forecast. Lazard then discounted the estimated dividend streams from Genworth's 52% ownership in Genworth Australia for the period 2017 through 2020 as set forth in the Base Forecast and implied terminal values to derive implied present values as of January 1, 2017 of Genworth's 52% ownership stake in Genworth Australia. Lazard used a range of discount rates from 9.0% to 10.5%, representing estimates of Genworth Australia's cost of equity, which resulted in implied present values of Genworth's 52% ownership

stake in Genworth Australia ranging from $506 million to $576 million, and a range of discount rates from 10.0% to 12.0%, representing estimates of Genworth's weighted average cost of capital, which resulted in implied present values of Genworth's 52% ownership stake in Genworth Australia ranging from $488 million to $561 million.

Lazard also derived an implied value for Corporate and Other, which resulted in an implied valuation of $(1.160 billion), using the following data provided by management of Genworth: (i) pro forma estimates of Genworth's cash (excluding restricted cash) and debt valued at book value as provided by Genworth's management (including estimated cash proceeds to Genworth from the assumed sale of its 57.3% stake in Genworth Canada, a one-time dividend paid by US MI to Genworth from the proceeds of an assumed debt issuance by US MI and cash proceeds to Genworth from its assumed sale of 19.9% of the outstanding shares of US MI in an initial public offering of US MI effective January 1, 2017 as reflected in the Base Forecast), (ii) the net present value of certain net deferred tax assets as of December 31, 2016 (valued using a discount rate of 8.0%, using the estimated utilization of such tax assets reflected in the Base Forecast) and (iii) the net present value of certain net accrued Genworth liabilities (valued using a discount rate of 8.0%, using the estimated net payment of such liabilities reflected in the Base Forecast).

Lazard added together the ranges of implied values it derived using the foregoing analysis to derive a range of implied equity values for Genworth, divided the result by the number of Genworth fully diluted shares outstanding provided by Genworth management and then discounted the implied values per share of Genworth common stock from January 1, 2017 to September 30, 2016 using a discount rate of 19.7% to derive a range of implied present values per share of Genworth common stock of $2.98 to $5.11.

Lazard also performed a sensitivity to its sum-of-the-parts analysis to analyze the impact of the sensitivities on the implied present values per share of Genworth common stock. Lazard calculated the sensitivity to its sum-of-the-parts analysis using the methodologies and discount rates described above, except that with the consent of the Board, and, based on the assessments of management regarding the uncertainty and risks associated with Genworth's LTC insurance business within Genworth's U.S. Life segment, Lazard assumed, for purposes of its analysis, that (i) morbidity claims costs for Genworth's LTC insurance business would be 4% higher over the forecast period than reflected in the Base Forecast and (ii) the LTC rate increases approved by the applicable regulators over the forecast period would be 10% less than the rate increases assumed in Genworth's multi-year rate action plan reflected in the Base Forecast. Lazard's consideration of the impact of the sensitivities in performing its dividend discount analysis with respect to U.S. Life resulted in implied present values for U.S. Life ranging from $0 to $1.484 billion (i.e., the sensitivities did not change the upper end of the range implied by using the Base Forecast). The sensitivity to the sum-of-the-parts analysis

performed by Lazard implied a range of present values of Genworth common stock of $1.24 to $5.11.

87. Without such undisclosed information, the Company's shareholders are not able to evaluate whether the financial analyses performed by Goldman Sachs and Lazard were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Merger.

88. Full disclosure of the omissions is required to ensure that shareholders can fully evaluate the extent to which Goldman Sachs' and Lazard's opinions and analyses should factor into their decision whether to vote in favor of or against the Merger.

**The Flawed Sale Process**

89. The Proxy fails to disclose material information relating to the sale process leading up to the Proposed Transaction:

(a) the indicative ratings developed by the S&P's Ratings Evaluation Service under two financial scenarios in connection with a merger of Genworth and China Oceanwide;

(b) which directors comprised the STC, the Company's Board's basis for appointing another director as an alternate member of the STC at the May 11-12, 2016 Board meeting and the identity of the alternate member;

(c) whether the Company has entered into confidentiality agreements with potential transaction counterparties (other than China Oceanwide), that contain standstill provisions and, if so, the details of any standstill provisions including whether they contain don't-ask-don't-waive standstill provisions that are precluding these parties from making a post-closing topping bid for the Company; and

(d) the reasons, if any, Company D did not submit any further inquiries or indications of interest to Genworth.

90. The omission of the above renders the following statements in the Proxy false and/or misleading:

(a) Page 56 of the Proxy states:

> On that same date, Genworth provided projections to S&P's Ratings Evaluation Service for its use in developing indicative ratings under two financial scenarios. On September 28, 2016, at the request of China Oceanwide, Genworth provided updated projections, including updated financial scenarios, to representatives of S&P's Ratings Evaluation Service. The first scenario used a pro forma projection which was substantially similar to the September projections and, in addition, assumed a $525 million China Oceanwide capital contribution to facilitate the unstacking and a $600 million China Oceanwide capital contribution to retire Genworth's debt due in 2018 but did not include any purchase accounting adjustments related to the China Oceanwide transaction or any improvement in interest rates. The second scenario used the same projections as under the first scenario projections but included an additional $600 million China Oceanwide capital contribution to retire a portion of additional debt due in 2020 and 2021 for a total debt reduction of $1.2 billion.

(b) Page 40 of the Proxy states:

> During the period from January 4, 2016 to June 21, 2016, Genworth and Company A remained engaged in negotiations regarding the proposed L&A Plus LTC Separation Transaction. Throughout this time, Company A and Genworth proposed many different iterations of the L&A Plus LTC Separation Transaction and the material terms of that transaction. During this time, the Board and, after it was established in March 2016, the Strategic Transactions Committee, comprised of independent directors (which we refer to as the "STC") (the formation of which is described below), was kept apprised of material developments with respect to the discussions and negotiations relating to the L&A Plus LTC Separation Transaction. On several occasions, the Non-Executive Chairman of the Board, James S. Riepe, participated directly in discussions with representatives of Company A regarding the material terms of the proposed L&A Plus LTC Separation Transaction. Board or STC meetings at which the L&A Plus LTC Separation Transaction and the ongoing discussions with Company A were discussed among the directors and with management and the financial and legal advisors of Genworth and the Board or the STC, as applicable, were held 12 times between January 26, 2016 and June 6, 2016.

(c) Pages 47-48 of the Proxy states:

> At this same meeting, the Board unanimously approved the formation of the STC comprised solely of independent directors. The purpose of the STC was to evaluate the strategic direction of Genworth, including potential strategic transactions involving Genworth, and to report and make recommendations to the full Board with respect to any such strategic transaction.
>
> * * *
>
> At the May 11-12, 2016 meeting, the Board appointed another independent director as an alternate member of the STC.

(d) Page 47 of the Proxy states:

> *Termination of discussions with Company D*
>
> On March 29, 2016, representatives of Company D met with representatives of Genworth to discuss matters relating to Company D's due diligence investigation of Genworth. After this meeting, Genworth did not receive any proposals, indications of interest or material inquiries from Company D.

91. Defendants' failure to provide the Company shareholders with this material information renders the statements in the Proxy false and/or misleading. Defendants were aware of their duty to disclose this information and acted negligently (if not deliberately) in failing to include this information in the Proxy. Absent disclosure of the information described above prior to the shareholder vote on the Proposed Transaction, Plaintiff and the other members of the Class will be unable to make a fully-informed decision whether to vote in favor of the Proposed Transaction and are thus threatened with irreparable harm warranting the injunctive relief sought herein.

## FIRST CAUSE OF ACTION

**(Violations of Section 14(a) of the Exchange Act And**
**SEC Rule 14a-9 Promulgated Thereunder)**

92. Plaintiff repeats and re-alleges each allegation set forth in paragraphs 1 through 91 above.

93. During the relevant period, Defendants disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

94. By virtue of their positions within the Company, Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and/or omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

95. The omissions and false and misleading statements in the Proxy are material in that a reasonable stockholder would consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

96. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

97. Because of the false and misleading statements in the Proxy, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## SECOND CAUSE OF ACTION

**(Violation of Section 20(a) of the Exchange Act)**

98. Plaintiff repeats and re-alleges each allegation set forth in paragraphs 1 through 91 above.

99. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers or directors of the Company and participation in or awareness of the Company's operations or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

100. The Individual Defendants were provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

101. The Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of this document.

102. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed

Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered — descriptions which had input from the Individual Defendants.

103. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

104. Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants, as follows:

A. Declaring that this action is properly maintainable as a class action and certifying Plaintiff as Class representative;

B. Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the highest possible price for shareholders and disclose and disseminate the material information identified above to the Company shareholders;

C. Directing Defendants to account to Plaintiff and the Class for all damages suffered by them as a result of Defendants' wrongful conduct as alleged herein;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees;

E. Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 6, 2017

**RIGRODSKY & LONG, P.A.**

*/s/ Brian D. Long*
Seth D. Rigrodsky (#3147)
Brian D. Long (#4347)
Gina M. Serra (#5387)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Tel.: (302) 295-5310
Fax: (302) 654-7530
sdr@rl-legal.com
bdl@rl-legal.com
gms@rl-legal.com

*Attorneys for Plaintiff*

**OF COUNSEL:**

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston
Thomas J. McKenna
440 Park Avenue South, 5th Floor
New York, NY 10016
Phone: (212) 983-1300